# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

FILED

01 SEP 14 PM 3: 00

U.S. DISTRICT COURT
N.D. OF ALABAMA

TWILA JOHNSON,                          ]
                                        ]
    Plaintiff(s),               ]
                                        ]
    vs.                         ]    CV-00-N-2866-S
                                        ]
**SHANER HOTEL GROUP d/b/a**            ]
**HOLIDAY INN AIRPORT,**                ]
                                        ]
    Defendant(s).               ]



**ENTERED**

SEP 1 4 2001

## Memorandum of Opinion

## I.    Introduction.

This is a federal question case.  28 U.S.C. §1331 (2001).  Plaintiff Twila Johnson ("Johnson"), a Caucasian female, is married to an African-American.  During the time relevant to this lawsuit, defendant Shaner Operating Corporation ("Shaner") employed Johnson in various positions in one of its hotels, Holiday Inn Airport, in Birmingham, Alabama. Johnson has brought this lawsuit against Shaner under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Fair Labor Standards Act, alleging disparate treatment, hostile work environment, and retaliation.  The matter now before this court is Shaner's motion for summary judgment.  The issues have been briefed by both parties and the motion is now ripe for decision.  Upon due consideration, the motion will be granted in part and denied in part..

54

## II.    Statement of Facts.[1]

Shaner hired Johnson on January 9, 1998 to serve as a cashier in the restaurant of its hotel. (Johnson Dep. at 42.)  On February 25, 1998, Johnson became a banquet manager for Shaner.  (*Id.*)  In May, 1998, Johnson asked for help in performing her job.  (*Id.* at 44-45.) At that time, Rick Voelsky, general manager of the hotel, and Terry McDowell, Johnson's direct supervisor, told her that she should step down as banquet manager or she would be fired.  (*Id.*)  Johnson decided to step down as banquet manager, and assumed the position of dining room supervisor at the hotel.  (*Id.* at 45.)

During the latter part of July, 1998, Johnson learned from another employee that she was no longer a supervisory employee.  (*Id.* at 49.)  As of October or November 1998, Johnson served as a cashier in the dining room of Defendant's hotel.  (*Id.* at 52.)  She remained in this position until she became a server in the dining room in January, 1999.  (*Id.* at 53.)  After serving as a cashier for approximately six weeks, Johnson became a bar tender.  (*Id.* at 54.)  In February 1999, Shaner reopened the dining room supervisor position, which Johnson applied for but did not receive.  (*Id.* at 55.)

On April 13, 1999, Johnson was suspended for three days. (Def.'s Ex. 8.)  The reason provided to Johnson for the suspension was that Johnson, in making a phone call to the individual who was hired as dining room supervisor, had displayed inappropriate behavior toward the new supervisor.  (Def.'s. Ex. 8; Johnson Dep. at 57.)  Upon returning from her

---

[1]The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

suspension, Johnson continued to work in the bar. (Johnson Dep. at 59.) Thereafter, Shaner hired two bartenders and Johnson once more became a server. (*Id.* at 60.) On October 16, 1999, Plaintiff was promoted to evening dining room supervisor. (*Id.* at 61.)

On an evening in January 2000, a snow storm forced a group of employees of AmSouth Bank to remain at Shaner's hotel. (*Id.* at 143) On the following morning, Faisal Abbasi, assistant manager at the hotel, received a complaint from an AmSouth supervisor that Johnson had treated several AmSouth employees rudely on the previous evening. (Abbasi Decl. at ¶7.) After receiving the complaint, Abbasi contacted Larry Goodwin, general manager of the hotel, and informed him of the complaint and the fact that he had counseled Johnson for rudeness to customers on other occasions. (*Id.* at ¶8.) Abbasi recommended to Goodwin that Johnson be terminated. (*Id.*) Johnson was thereafter terminated. (Johnson Dep. at 151.)

After she was terminated, Johnson called an employee-dedicated line and, after leaving a message, spoke with Lisa Woodruff in Human Resources with Shaner. (*Id.* at 151-52.) Woodruff informed Johnson that there would be an investigation. (*Id.* at 152.) Johnson spoke with Goodwin after that, who informed Johnson that an investigation was underway. (*Id.*) A few days later, Johnson again spoke with Goodwin. (*Id.*) He informed her that the investigation had been concluded and that her dismissal would be upheld. (*Id.*)

Throughout her employment with Shaner, a number of events occurred upon which Johnson rests her complaint. In 1998, Louis Scurlock, a Caucasian, who supervised maintenance at Shaner's hotel, commented to Johnson that he hated to have to hire "niggers" when there were perfectly good white boys coming in to apply for jobs, but that

3

because of discrimination law suits, he had to continue hiring "niggers." (*Id.* at 80.)
Johnson reported this comment to Terry McDowell, who was food and beverage director
at the defendant's hotel at that time. (*Id.* at 80-81.) She also complained about Scurlock's
comment to Faisal Abbasi, who was the assistant manager of the hotel at that time. (Johnson
Decl. at ¶ 20.)  Abbasi told Johnson to ignore Scurlock and do her job. (Pl.'s Ans. Int. at
#14.)  Nothing happened to Scurlock in regard to Johnson's complaints to McDowell and
Abbasi. (*Johnson Dep.* at 81.)  In June of 1998, Johnson complained to a representative from
corporate headquarters who trained general managers that she did not feel like anything
had been done in regard to her complaint about Scurlock's comment. (*Id.* at 88.)  The
representative suggested to Johnson that she speak with Tony Vickers when he was due
to come in, later that year. (*Id.*)  Johnson attempted to speak with Vickers when he arrived
in August or September, 1998, but was told by the general manager of the hotel at that time,
Vickie Tucker, that he was too busy to speak with Johnson. (*Id.* at 89-90.)  Although
Scurlock made no further racial comments to Johnson after learning that her husband is
African-American, he would spit every time he saw her. (*Id.* at 81-82.)

Johnson refers in some detail in her brief to several incidents involving Scurlock that
were not directed at her. (Pl.'s Resp. to Def.'s Mot. Summ. J. at 37-40.)  For example,
Scurlock referred to the African-American men working in the maintenance department as
"those Bubbas." (Kegler Dep. at 30.)  He referred to Randy Price, an African-American
employee, as "boy." (*Id.*)  He referred to another of Johnson's black co-workers as "stupid
nigger." (*Id.*)

4

Scurlock explained to another coworker, Solomon Kegler, that the reason he wanted him to assist him on side jobs was because he was lighter-skinned that the other African-American employees. (*Id.* at 43-44.) Sculock informed Kegler that he could not take another employee, Cedric, because he was "too dark." (*Id.* at 44.) He further told a different employee that the employee was "too tan" to assist him with outside jobs. (Prince Dep. at 24.) He requested that Kegler purchase supplies for the hotel because he did not want the suppliers to see "those niggers." (*Id.* at 49.)

Scurlock referred to two of the African-American employees as "house niggers" as opposed to "field niggers." (Prince Dep. at 23.) He refers to his Puerto Rican girlfriend as "a frijole cooking motherfucker" and a "suntanned slave." (*Id.* at 35.) He derogatorily refers to African-American employees as "you people," and commonly referred to the black women in housekeeping as "black bitches," "bitches," and "lazy nigger bitches." (Kegler Dep. at 66-67; Prince Dep. at 25-30, 72; James Dep. at 39.)

Scurlock did not want his black employees to drink out of the water fountain in the lobby of the hotel. (James Dep. at 18.) He removed the water fountain. (*Id.* at 19.) He said that he had a hose pipe from which the employees could get a drink of water. (*Id.* at 20.)

Scurlock controlled the temperature in the conference room and other common areas of the hotel. (Prince Dep. at 54-55.) He could operate the temperature from his home and preferred not to adjust the temperature for African-American guests. (Kegler Dep. at 98-99.) If African-American guests were hot, Scurlock would say that the guests should be used to the heat. (Prince Dep. at 54.)

5

Beyond Louis Scurlock, Johnson complains of a number of other incidents in support of her claims. Shortly after Johnson was hired, Terry McDowell, a Caucasian, who was food and beverage director at the defendant's hotel, made comments to Johnson regarding whether she was concerned about how people would perceive her biracial children and whether she was "worried about how people think about you being married to a black man and you being white and couldn't you find a white man." (Johnson Dep. at 83-84.) By the end of March 1998, McDowell's comments had gotten worse and more frequent. (*Id.* at 84.) Plaintiff complained to Faisal Abbasi in April 1998, about McDowell's comments. (*Id.*) Several weeks later, McDowell was fired. (*Id.* at 85.) Vickie Tucker, general manager of the hotel at that time, informed Johnson that McDowell had been fired because he had been having dinner in the hotel restaurant with his girlfriend and daughter while he was supposed to be working. (*Id.* at 85.) When Johnson complained to the corporate representative who trains general managers concerning her impression that nothing was done in regard to her complaint about Louis Scurlock, she also complained to the representative that no action had been taken by Shaner in regard to McDowell and his offensive comments to her. (*Id.* at 88.) As with her complaint to the representative concerning Scurlock, the representative suggested that she speak with Tony Vickers when he was due to come in. (*Id.*) As noted above, Johnson was unable to speak with Vickers during his visit to the hotel. (*Id.* at 89-90.)

At one point, Faisal Abbasi informed Johnson that she was too close to her black employees. (*Id.* at 95.) Approximately one month later, during a meeting of management in September 1999, at which all of the hotel managers were present, Guntrum Anderlik, Johnson's direct supervisor, repeated this comment to her, telling her that she was too close

6

to her black employees and that she should distance herself from them. (*Id.* at 95-96.) He repeated this comment to her at least five or six times thereafter. (*Id.*)

Johnson attended a bartending meeting for the purpose of taking a certification test for bartending. (*Id.* at 96.) As other employees had done at previous meetings, Johnson brought her child to this meeting. (*Id.* at 96-98.) During the meeting, Johnson's son remained in the restaurant where one of the servers teased the child, causing him to laugh. (*Id.* at 98-99.) Johnson admits that she heard her child laugh once during the meeting. (*Id.* at 99.) After the meeting, Vickie Tucker, the general manager, asked Johnson not to bring her child back. (*Id.* at 100.) The following week, in a meeting, Tucker announced that no one could bring their children to meetings because it was disruptive. (*Id.* at 101.) Johnson was offended by the way in which Tucker referred to her son as "him" and used mannerisms to describe him, that she had waited until Johnson brought her son to a meeting to make a public announcement that children should not be brought to meetings, and the fact that Tucker looked down her nose at Johnson's son in disgust. (*Id.* at 103-05.) Shaner, in response, presented uncontroverted evidence that Tucker also told Sherryl White, an African-American server at the hotel, not to bring her children to the hotel. (White Decl. at ¶3.)

In 1999, Johnson had problems with an African-American banquet chef who was new. (Johnson Dep. at 109.) After offering to help the chef out because he did not have very much experience with banquets, he told other employees that Johnson thought that she was "all that" because she was married to an African-American. (*Id.* at 109-10.) The chef also made this statement to Johnson's face. (*Id.* at 110.)

7

Johnson had problems with comments made by Tracy McCoy, an evening cook, and Harold Gaines, a banquet cook, both of whom are African-American. (*Id.* at 110-11.) Toward the end of Johnson's employment with Shaner, McCoy told Guntrum Anderlick that Johnson thought she was "all that" because she had been made a supervisor again. (*Id.* at 112.) Gaines made some racial comments to Johnson that she found to be inappropriate. (*Id.* at 110-11.) As an example, Johnson recounted in her deposition that Gaines commented to her that "once you go black, you never go back." (*Id.* at 111.) Johnson reported Gaines' comments to Vickie Tucker, who laughed and responded that that was just how Gaines was. (*Id.* at 111.) Johnson also complained about Gaines' comments to David Stevenson, who, at that time (January or February, 1999) was food and beverage manager at the hotel. (Pl.'s Ans. Int. at #14.)

Johnson had problems with Al, an African-American who served as a cook at the hotel. (*Id.* at 113-14.) Al refused to cook Johnson's food orders and made comments to her suggesting that she thought she did not have to do certain things because she was married to a black man. (*Id.* at 114.) Both Al and Johnson were brought into David Stevenson's office to talk about the problem, which afterwards got a little better, but was never completely resolved. (*Id.* at 114-15.) Al made racial comments to Johnson, to the extent that she thought that she was "all that" because she was married to a black man and asked her if something was the matter since she could not find a white guy, where she belonged. (*Id.* at 114.) Al eventually quit working at the hotel. (*Id.* at 115.)

Johnson also had difficulties with Lorretha Latham, an African-American, who Johnson and Amanda Beal, another supervisor, attempted to train in the hotel's dining room to

8

handle cash. (*Id.* at 117.) Johnson and Beal expended a great deal of time trying to train Latham, but she could not "get the figures in her head." (*Id.*) Although Latham did not make any racial comments, according to Johnson, she did not like to deal with white people. (*Id.* at 118.) Johnson believes the fact that she is white made it difficult for Latham to get along with her and that Johnson's being married to an African-American was an "added incentive" for Latham to attempt to anger her. (*Id.* at 118.)

Doreta, an African-American, was day shift supervisor and was treated differently than Johnson by management. (*Id.* at 119.) Doreta worked less hours than Johnson while Johnson was evening supervisor. (*Id.*) Further, Doreta was not on call on her off days, even though Johnson was. (*Id.*) Both Johnson and Amanda Beal, another supervisor, were required to work double shifts during big events, such as race weekends, while Doreta was not required to. (*Id.* at 119.) Johnson denies that Shaner treated Doreta more favorable because Doreta is African-American. (*Id.*) She cites as the basis for the different treatment her belief that Larry Goodwin, an African-American, who was general manager of the hotel beginning in August 1999, and who had hired Doreta, is a racist. (*Id.* at 120.) Further, she was not treated as fairly as Doreta because she was married to an African-American and associated with black people. (*Id.* at 122-23.)

In support of its decision to fire Johnson, Shaner put forward the following undisputed facts. Faisal Abbasi, who is of Pakastani-descent, served as assistant manager of the hotel during most of Johnson's employment with Shaner. (Abbasi Decl. at ¶2.) Although Johnson was only counseled twice by Abbasi and is unaware of any other complaints made against her, (Johnson Decl. I at ¶17) Abbasi received "numerous" complaints about Johnson's

9

attitude toward customers and her treatment of customers in the restaurant and bar areas. (Abbasi Decl. at ¶3.) Abbasi also received complaints about Johnson to the effect that she disparaged the hotel and Shaner Hotel Group in front of customers. (*Id.*) Abbasi learned from one of the servers that two guests in the restaurant had asked the server if something was wrong with Johnson and then refused to have Johnson wait on them. (*Id.* at ¶4.) In addition to informal complaints, four formal complaints against Johnson were written on guest comment cards. (*Id.* at ¶6.) Though he claims to have confronted Johnson with all of these cards, a reasonable jury could find that Abbasi made Johnson aware of only two of the comment cards. (Johnson Dep. at 153.) The comments on the cards referred to Johnson as a waitress being very obnoxious and doing a disservice to the establishment. (*Id.*)

In contrast to the above, Johnson presented several notes from guests of the hotel complimenting the service with which she provided them while they were at the hotel. (Pl.'s Exs. 9-11.) She also presented a note from Fred Shaner, president of the defendant corporation, in which he states, "You were special enough to be mentioned as someone who is doing a superb job at our hotel. Please find a token of our appreciation of your efforts. Having someone like you in our organization is definitely 'OUR PLEASURE.'" (Pl.'s Ex. 11.) This exhibit includes an invoice stub in the amount of $10.00. (*Id.*) The stub is dated July 8, 1999. (*Id.*)

On the morning of Johnson's termination, Abbasi received a complaint from a supervisor at AmSouth Bank concerning Johnson. (Abbasi Decl. at ¶7.) The supervisor complained that several of his employees had been treated rudely by Johnson on the preceding evening and that Johnson had made several derogatory comments about

10

AmSouth Bank to one of his employees in particular. (*Id.*) Johnson denies that she acted in this way. (Johnson Dep. at 143-50.) Moreover, Johnson has produced evidence that customers complained about all of the employees on duty on that particular evening, based on the fact that there were not enough employees on duty to handle the volume of guests in the hotel and restaurant. (Anderlik Decl. at 30-31.)

After receiving the complaint from the AmSouth Bank supervisor, Abbasi contacted Larry Goodwin, an African-American, who was general manager of the hotel at that time, and told him of the complaints that the AmSouth supervisor had made about Johnson, as well as the fact that Abbasi had counseled her on other occasions. (Abbasi Decl. at ¶8.) Abbasi told Goodwin that Abbasi believed Johnson's behavior was unacceptable and the infractions were strong enough to warrant termination of her job. (*Id.*) Abbasi recommended to Goodwin that Johnson be terminated. (*Id.*) A reasonable jury could find that upon deciding to fire Johnson, Goodwin called Anderlik in to his office and told him "I hate this white bitch," in reference to Johnson. (Anderlik Decl. at 22-23.) Goodwin then told Anderlik to notify Johnson of her termination. (*Id.* at 23-24) When asked in his statement if he knew why Goodwin wanted Johnson fired, Anderlik responded, "I think he told her more than once, once or twice, not to come to him anymore with any kind of complaints whatsoever. And I think that day she came again with a complaint to him, and he blew his gasket." (*Id.*)

## III. Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

11

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to

12

determine whether there is a genuine issue for trial." *Id*. at 249.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   Discussion.

As grounds for its motion for summary judgment, Defendant Shaner sets forth a number of arguments.  Each of these arguments is addressed below.

### A.    Failure to state claim upon which relief can be granted.

Defendant first argues that Plaintiff's claims should be dismissed because Plaintiff failed to specifically allege that Defendant intended to discriminate against her.  Defendant cites *Coleman v. Houston Independent School District*, 113 F.3d 528 (5th Cir. 1997) for the proposition that "a cause of action for racial discrimination in the making and enforcement of contracts, under § 1981, requires the plaintiff to demonstrate intentional discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 73 L. Ed. 2d 835, 102 S. Ct. 3141 (1982); *National Ass'n of Gov't Employees v. City Pub. Servs. Bd.*, 40 F.3d 698, 714 (5th Cir. 1994)." *See Coleman v. Houston Independent School District*, 113 F.3d 528, 533 (5th Cir. 1997).

13

Although it is true that Plaintiff must prove that Defendant discriminated against her intentionally, she need not allege this with specificity in her complaint. *See Leonard v. Frankfort Electric & Water Plant Bd.*, 752 F.2d 189, 193 (6th Cir. 1985) ("Thus, where a complaint alleges facts evidencing such a discriminatory purpose or intent, although it fails to specifically allege a discriminatory purpose, it is sufficient to state a claim under §1981."); *Shah v. MedPath Corp.*, 470 F. Supp. 158, 160 (E.D. Pa. 1979) ("Defendants also argue that intentional discrimination is an essential element of a section 1981 claim, and that plaintiff has nowhere alleged the requisite intent. The first half of this argument is well-taken: I have held on several occasions that liability under section 1981 requires intentional discrimination. But it does not follow that a section 1981 plaintiff must plead the legal conclusion that 'defendants intentionally discriminated on the basis of race' in order to survive a motion to dismiss. Instead, it is sufficient if the complaint contains allegations from which the requisite intent may reasonably be inferred.") (citations omitted). Because discrimination on the part of the Defendant can reasonably be inferred from the facts alleged by the Plaintiff in her Complaint, summary judgment will not be granted on this basis.

## B.    Hostile Environment.

### 1.    EEOC Charge.

Defendant argues that Plaintiff failed to allege a racially hostile environment in her EEOC charge. Plaintiff's claim under section 1981 would survive whether or not she included those claims in her EEOC charge, *see Alpha Portland Cement Co. v. Reese*, 507 F.2d 607, 608 (5th Cir. 1975), so the question is whether her Title VII hostile work

14

environment claim can be considered by this court. In *Mulhall v. Advance Security, Inc.*, 19 F.3d 586 (11th Cir. 1994), the Eleventh Circuit stated that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Mulhall*, 19 F.3d at 589 n.8 (*citing Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970) (Title VII complaint may encompass discrimination like or related to allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the Commission.)).

The plaintiff alleged in her EEOC charge that she "refused to disassociate [herself] from [her] Black staff as had been requested by management both directly and indirectly on previous occasions." (Pl.'s Ex. 1.) Plaintiff also specifically alleged discrimination due to race, in addition to retaliation. Considering the allegations of Plaintiff's EEOC charge and the reasonableness of concluding that the resulting EEOC investigation would trigger an inquiry into the possibility of a hostile work environment, a claim of hostile work environment is like and related and could reasonably by expected to grow out of the allegations.

## 2.    Prima Facie Case.[2]

The elements of a prima facie case of racially hostile work environment are: (1) Plaintiff is a member of a protected class; (2) Plaintiff was subjected to unwelcome racial harassment; (3) the harassment was based upon her race; (4) the harassment was

___

[2]The Court analyses both bases of Plaintiff's hostile work environment claim, Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981, simultaneously because "the elements of a prima facie case of hostile environment racial harassment under Title VII are the same for employment claims brought pursuant to §1981." *Shields v. Fort James Corp.*, 2001 WL 392667, *8 n.21 (S.D. Ala. April 9, 2001); *see Bass v. Bd. of County Comm'rs*, 242 F.3d 996, 1009 n.4 (11th Cir. Feb. 21, 2001); *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994).

15

sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatorily abusive environment; and, (5) a basis for holding the employer liable. *See Shields v. Fort James Corp.*, 2001 WL 392667, *5 (S.D. Ala.) (*citing Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582-83 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001)). While Shaner concedes that Johnson has established the first element by virtue of the fact that she is involved in an interracial marriage, *see Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986), Shaner argues that Johnson is unable to establish the remaining elements.

Although a plaintiff must establish all five elements to succeed in a claim of racially hostile work environment, the Eleventh Circuit has noted that "[t]he fourth element--that the conduct complained of was 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment'--is the element that tests the mettle of most ... harassment claims." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001). Proof of this element "ensures that Title VII does not become a mere 'general civility code.'" *Id.* (*citing Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). In order to establish that the harassment to which a plaintiff was subjected was unlawful, she must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

16

To make such a showing, the Eleventh Circuit has required that a plaintiff demonstrate that her work environment was one that "'a reasonable person would find hostile or abusive' and that 'the victim ... subjectively perceive[s] ... to be abusive.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*quoting Harris*, 510 U.S. at 21) (alteration in original). In reviewing whether a reasonable person would find the plaintiff's workplace sufficiently hostile or abusive to warrant a claim of harassment, the Eleventh Circuit has said:

> The objective component of this analysis is somewhat fact intensive. Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

*Id.* (citations omitted). Thus, this court is called on to "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.* (citations omitted).

As for the fifth element, whether there is a basis for holding Shaner liable for the harassing acts of its employee, the Eleventh Circuit has held that an employer is strictly liable for the harassing acts of its employee if (1) the employee was the victim's supervisor, and (2) the supervisor took a tangible employment action against the victim as a result of the harassment. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509-

17

10 (11th Cir. 2000). Apart from strict liability, an employer can be liable for the harassing acts of the victim's supervisor even if the supervisor did not take a tangible employment action against the victim, unless it asserts the affirmative defense established by the United States Supreme Court in *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998) (employer "exercised reasonable care to prevent and correct promptly any ... harassing behavior," and the victim "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [the employer] or to avoid harm otherwise." *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998)). *See id.* Moreover, an employer can be liable for harassment by its non-supervisory employees if it had actual notice or constructive notice of the harassment and failed to remediate the situation. *See id.*

Turning to the evidentiary record produced by both parties in regard to defendant's motion for summary judgment and viewing the facts in the light most favorable to the plaintiff, Johnson has demonstrated a prima facie case of racially-hostile work environment, in that she has produced evidence from which a reasonable jury could conclude that: (1) Johnson is a member of a protected class by virtue of her interracial marriage; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatorily abusive environment; and (5) there is a basis for holding Shaner liable.[3] As plaintiff's establishment

---

[3] In its brief in support of its motion for summary judgment, defendant did not raise, in relation to plaintiff's hostile work environment claim, the defense that only incidents that occurred within 180 days of the filing of the plaintiff's EEOC charge are admissible to prove a hostile work environment. This defense is subject to waiver and estoppel. *See Zipes v. Transworld Airlines, Inc.*, 455 U.S. 385, 393 (1982). Moreover, the court notes that the record is unclear as to whether a significant number of the incidents upon which the plaintiff rests her hostile work environment claim occurred within or without the 180 day period preceding the filing of the EEOC complaint.

18

of the first element is not contested by defendant, the following discussion focuses on the remaining four elements.

Johnson has demonstrated that a reasonable jury could find that she was subjected to unwelcome racial harassment. Among other incidents, Johnson has produced evidence that: Louis Scurlock told Johnson on one occasion that he "hated to have to hire niggers when there were perfectly good white boys coming in to apply for jobs" and that "because of the discrimination suits, he had to continue hiring niggers." After discovering that Johnson was married to an African-American, Scurlock would spit every time he saw her.[4] Other incidents of which Johnson has produced evidence concern comments which a reasonable jury could find to be unwelcome racial harassment made by a number of individuals employed by Shaner at the Holiday Inn Airport hotel. Those individuals include Terry McDowell, who was food and beverage director for Shaner when Johnson was hired, Guntrum Anderlick, who was Johnson's direct supervisor, Faisal Abbasi, who was Shaner's assistant manager, an unnamed banquet chef, Al, who was a cook, and Harold Gaines, who was a banquet cook. Moreover, a reasonable jury could find that almost all of the comments of the individuals listed above of which Johnson complains concerned her marriage to an African-American, satisfying the third element of Johnson's prima facie case.

---

[4]Plaintiff has also presented evidence that Louis Scurlock made a number of racially-derogatory comments to other employees of Shaner. Defendant has objected to the admission of these comments, arguing that they are irrelevant because they were neither directed at nor did they concern plaintiff. However, because this court finds that plaintiff was able to produce evidence that created a genuine issue of material fact even without these comments, rendering summary judgment inappropriate as to her claim of racially-hostile work environment, the court does not reach the question of whether and for what purposes Scurlock's comments directed to other employees will be admissible at trial.

19

As for the fourth element of the prima facie case, the court finds that there is a genuine issue of material fact as to whether the harassment that Johnson endured was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatorily abusive environment. While the court recognizes that the purpose of Title VII is not serve as a civility code in the workplace, Johnson has presented sufficient evidence that the workplace at Shaner was both subjectively and objectively hostile. As to the subjective analysis of the hostile environment counts, there is sufficient evidence, both in her deposition and in her sworn statements, from which a reasonable jury could conclude that Johnson subjectively perceived the environment at the hotel to be hostile. As to the objective analysis of whether a reasonable person would find Johnson's workplace to be hostile, the court finds that when the totality of the circumstances are taken into account, a reasonable jury could find that the complained of conduct was frequent, severe, and humiliating. Moreover, the evidence presented could lead a reasonable jury to conclude that the harassment of which Johnson complains unreasonably interfered with her job performance.

Finally, Johnson has presented evidence from which a reasonable jury could find that there is a basis for holding Shaner liable.[5] As discussed above, the Eleventh Circuit has noted that one of the bases upon which an employer can be held liable for the harassing acts of its employees against other employees is if the employer had actual or constructive

---

[5] In its submission in reply to Johnson's response to the summary judgment motion, Shaner directly addressed this element of the prima facie case for the first time. Shaner only discusses this element, however, to the extent that it cannot be held strictly liable for the acts of which Johnson complains. Shaner ignores the other grounds upon which it can be liable for the harassing acts of its employees, set out *supra*. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509-10 (11th Cir. 2000).

notice of the harassment and failed to remediate the situation. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509-10 (11th Cir. 2000). Johnson complained to both the general and assistant managers at Shaner's hotel about Louis Scurlock's racially-offensive comments. She has presented evidence, which Shaner has failed to rebut, that no action was taken against Scurlock. In fact, she was told by the assistant manager that she should just ignore Scurlock and do her job. After Terry McDowell made a number of offensive comments to Johnson regarding her marriage to an African-American, Johnson complained to the assistant manager of the hotel. Although McDowell was terminated shortly thereafter, the hotel's general manager informed her that McDowell's termination was based upon poor job performance. There is no indication that the termination was, in any way, related to his offensive comments. Johnson complained to a corporate representative for Shaner that no action was taken in regard to her complaints about McDowell and Scurlock. The representative suggested that she speak with a second person who would be coming to the hotel some time later in the year. Johnson was not able to speak with the second person, however, because, she was told by the general manager of the hotel that the second individual was too busy to speak with her.

On one occasion, Johnson complained to the general manager of the hotel that a banquet cook made some inappropriate racial comments to her. The general manager laughed and told Johnson that that was just how that employee was. In a separate incident, Johnson complained to her supervisor that a cook at the hotel refused to cook her food while she was waiting on customers and made derogatory comments to her in regard to her interracial marriage. Although the problems between Johnson and the cook got better after

21

the supervisor met with both of them, problems remained. Johnson further complained on at least three or four occasions to Wilma Clark, Shaner's night manager and one of Johnson's supervisors, that she was being discriminated against by Shaner based on her interracial marriage.

Finally, Shaner's management itself made several comments to Johnson that could be construed by a reasonable jury as racially-hostile. Particularly, the assistant manager and the food and beverage director of the hotel both told Johnson on several occasions that she was too close to her African-American employees and should distance herself from them. At one point, this comment was made in a meeting at which all of the hotel management was present.

Johnson has demonstrated that Shaner had, at the very least, constructive knowledge of the harassment to which Johnson was subjected by its employees, based on the numerous complaints that she made both to management at the hotel and to the corporate representative who visited the hotel in June, 1998. Further, she has put forth evidence from which a reasonable jury could conclude that Shaner failed to take remedial action in regard to the racially-hostile environment present at its hotel.

Reviewing the evidence in the light most favorable to the plaintiff, this court is of the opinion that there is a genuine issue of material fact as to whether Shaner subjected plaintiff to a racially-hostile work environment. Summary judgment will therefor be denied as to counts 1 and 4 of Plaintiff's complaint.

**C.    Disparate Treatment.**

22

The Eleventh Circuit has noted that, as with claims of hostile work environment, "[t]he elements of a claim of race discrimination under 42 U.S.C. §1981 are ... the same as a Title VII disparate treatment claim in the employment context." *See Rice-Lamar v. Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000). Therefore, the Court addresses Johnson's separate counts of disparate treatment under Title VII and 42 U.S.C. §1981 together, employing the McDonnell Douglas/Burdine framework established by the United States Supreme Court. *See Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

In order to succeed at summary judgment on a claim of disparate treatment, a plaintiff must show purposeful discrimination on the part of the defendant. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950 (5th Cir. 1981). Purposeful discrimination can be shown by either direct or circumstantial evidence. *See Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). Direct evidence is evidence that, "if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). Should a plaintiff produce direct evidence that discrimination motivated the employment decision complained of, the defendant must prove that the same employment decision would have been made in the absence of the discriminatory motivation. *See id.* The Court points out, however, that "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996).

23

In the absence of direct evidence, a plaintiff must demonstrate the defendant's

discriminatory intent by establishing a prima facie case of discrimination. *See Berman* at

701-02. In order to do so, the plaintiff must show that: (1) she is a member of a protected

class; (2) she was subjected to adverse employment action; (3) her employer treated

similarly situated employees who are not members of the plaintiff's class more favorably;

and (4) she was qualified for the job or job benefit at issue. *Rice-Lamar v. Fort Lauderdale,*

232 F.3d 836 (11th Cir. 2000). Once the plaintiff has shown a prima facie case,

> "the defendant must clearly set forth, through the introduction of admissible
> evidence, the reasons for the plaintiff's rejection. The explanation provided
> must be legally sufficient to justify a judgment for the defendant. If the
> defendant carries this burden of production, the presumption raised by the
> prima facie case is rebutted, and the factual inquiry proceeds to a new level
> of specificity....
>
> "... [The plaintiff] now must have the opportunity to demonstrate that the
> proffered reason was not the true reason for the employment decision. This
> burden now merges with the ultimate burden of persuading the court that she
> has been the victim of intentional discrimination. She may succeed in this
> either directly by persuading the court that a discriminatory reason more
> likely motivated the employer or indirectly by showing that the employer's
> proffered explanation is unworthy of credence."

*Id.* at 843 (*quoting Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)).

Turning to the evidentiary record, it is clear to the Court that Plaintiff has failed to

establish the existence of a genuine issue of material fact as to her disparate treatment

claims. Johnson has presented neither direct evidence of discriminatory intent on the part

of Shaner nor a prima facie case of discrimination as called for under the McDonald

Douglas/Burdine test. At the outset, the court notes that Johnson has not clearly explained

in her submissions to the court how she has been treated differently than her co-workers.

The court can only assume that Johnson is challenging her dismissal and the different

requirements of employment imposed upon her and Dorrinda Owens, the day shift supervisor.[6]

Johnson has put forth no direct evidence that, if believed, necessarily establishes that Shaner took her protected status into account when requiring that she work more hours as night-shift supervisor than the day-shift supervisor and when terminating her. Although she points to a number of statements by her supervisor Guntrum Anderlick and Larry Goodwin, the general manager of the hotel at the time she was fired, none of these statements even remotely approach the definition of "direct evidence."[7] Put another way, even if the Court were to accept as true all of the statements alleged by Johnson to have been made by Anderlick and Goodwin, those statements at most raise an *inference* of discriminatory motivation, and do not prove that her protected status played a role in the complained of employment decisions.

Johnson is likewise unable to support her claims of disparate treatment through the presentation of a prima facie case. The court finds that there is a genuine issue of material fact as to the first, second, and fourth elements of a prima facie case: Johnson is a member

---

[6]Johnson states in her complaint, "Other employees were not terminated for behavior that was equal to or greater than that allegedly engaged in by the plaintiff," within the context of the events surrounding her termination. She remarks in her Responsive Submission to Shaner's motion for summary judgment that "Shaner argues that Dorrinda Owens worked fewer hours and had no call, which is exactly what Ms. Johnson points to as evidence of disparate treatment." The court has gleaned from these representations the basis of Johnson's disparate treatment claim.

[7]Johnson submits the following in her responsive brief as direct evidence: (1) Guntrum Anderlick told her to distance herself from her African-American employees; (2) Larry Goodwin made disparaging remarks to Anderlick in regard to Johnson's interracial marriage; (3) Goodwin was "hypercritical" of Johnson's work performance; (4) Goodwin "was a racist"; (5) on the day she was terminated, Goodwin told Anderlick to fire the "white bitch"; and (6) Johnson was told by a co-worker, Louis Scurlock, that he hated to "have to hire niggers." Johnson does not allege that Scurlock was involved in the employment decisions of which she complains. His statement cannot, therefore, support a case of direct evidence of discriminatory motivations. *See Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449 (11th Cir. 1996).

25

of a protected class, she was subject to adverse employment action, and there is evidence from which a reasonable jury could conclude that she was qualified for the job from which she was terminated. However, Johnson is unable to show that Shaner treated similarly situated employees who were not involved in interracial relationships more favorably when it terminated her for excessive customer complaints.

In her answer to defendant's interrogatories, Johnson listed five individuals as comparators for the purpose of establishing that employees outside of her protected class were treated more favorably. Patrice Goodwin, a black room server, received several complaints, more than one of which was directed to management, regarding the room service she provided. (Johnson Dep. at 217-18.) Shaner fired Goodwin in August 2000 for cash handling problems. (Larry Goodwin Decl.) Michael Thomason, who is white and had no written customer complaints against him directed to management, was fired by Shaner in September 1999 for unprofessional behavior. (Johnson Dep. at 219; Larry Goodwin Decl.) Lorretha Latham, an African-American server, was fired in March 2001 after she received a number of guest complaints and failed to show for work. (Larry Goodwin Decl.) Dave Tankersley, a Caucasian bar manager who still works for Shaner, has never had any complaints directed to management from any customer. Likewise, Dorinda Owens, who is African-American and is still employed by Shaner, has never had any customer complaints directed to management. Based upon these five employees, Johnson has failed to show that Shaner treated similarly situated employees more favorably when it terminated her. Shaner treated two of the five employee-comparators in the same manner as it treated Johnson: it terminated them after they received complaints from guests. One of the five was

terminated for unprofessionalism.  The remaining two are not similarly situated to Johnson because there is no evidence that there have ever been any written customer complaints against them directed to management, the reason for which Shaner terminated Johnson.

The only other allegation of disparate treatment by Johnson is that Dorrinda Owens, who is black, worked less hours and did not have to be on call on her off days like Johnson. Although both Johnson and Owens served as "primary supervisors" at the Holiday Inn, Owens supervised the day shift while Johnson supervised the evening shift.  In her deposition, Johnson stated, "We were both supervisors.  Our treatment should have been equal.  She should have been expected to do the same thing that I was expected, but it was not." (Johnson Dep. at 122.)  However, she also noted during her deposition that Owens was not a working supervisor while Johnson was. (Johnson Dep. at 73.)  This meant that Owens was not required to wait tables. (*Id.*)  In her position as day shift supervisor, "[s]he stood up. She took money. She greeted. She oversaw, sometimes she bused tables." (*Id.*) Johnson, on the other hand, was known as a "working supervisor," which required that in addition to her duties as supervisor, she was required to wait tables. (*Id.* at 73-74.)  In light of Johnson's own acknowledgment that the work loads between her and Owens was different, and the fact that she has done nothing more than put forward her subjective belief that she and Owens should have been treated the same in spite of their different roles and titles, the court finds that Owens was not similarly situated to Johnson.

Because Johnson has neither put forward direct evidence nor established a prima facie case of discrimination on the part of Shaner, the court need not address Shaner's proffered legitimate business reason for terminating Johnson.  Johnson has failed to show

that there is a genuine issue of material fact as to her counts alleging disparate treatment, and summary judgment will therefore be granted in favor of Shaner on counts 2 and 5.

**D.   Retaliation under Title VII, 42 U.S.C. §1981, and FLSA**

According to the United States Supreme Court, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Eleventh Circuit has held that the moving party must identify for the district court the portions of the record that demonstrate the lack of a genuine issue of material fact. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994). Beyond its initial, broad ground that all of the plaintiff's claims are due to be dismissed for failure to plead that the defendant's actions were intentional, which, as discussed *supra*, will not serve as a ground upon which to support summary judgment in this case as to any ground, the defendant has failed to address all three of plaintiff's retaliation counts. As a result, summary judgment will be denied as to these counts.

**V.   Conclusion.**

Accordingly, the defendant's motion for summary judgment will be granted as to counts 2 and 5. Summary judgment will be denied as to the remaining counts. The court will enter an appropriate order in conformity with this opinion.

28

Done, this _____ of September, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE